UNITED STATES COURT OF APPEALS

FOR THE SECOND CIRCUIT

—————————————

August Term, 2010

(Argued: September 8, 2010    Decided: May 4, 2011)

Docket No. 09-2905-pr

—————————————

ELLIS WOOD,

*Petitioner-Appellant*,

—v.—

ROBERT ERCOLE, Superintendent,

*Respondent-Appellee*.

—————————————

Before:

LIVINGSTON and LYNCH, *Circuit Judges*, and SESSIONS, *District Judge*.*

—————————————

Petitioner-appellant Ellis Wood appeals from a judgment of the United States District

Court for the Eastern District of New York (Charles P. Sifton, *J*.) denying his petition for a

writ of habeas corpus.  On appeal, Wood argues that the state trial court erred in admitting

—————————————

* The Honorable William K. Sessions III, Chief Judge, United States District Court
for the District of Vermont, sitting by designation.

1

a videotaped statement he made while in police custody. We conclude that the statement was erroneously admitted in violation of Wood's Fifth and Fourteenth Amendment right to counsel, and that this error had a substantial and injurious effect on the jury's verdict. Therefore, we REVERSE the judgement of the district court and REMAND with instructions to grant the writ.

Judge Livingston dissents in a separate opinion.

————————

ARTHUR H. HOPKIRK, The Legal Aid Society, New York, New York, *for Petitioner-Appellant*.

MORGAN J. DENNEHY, Assistant District Attorney (Leonard Joblove, Jodi L. Mandel, Assistant District Attorneys, *on the brief*), *for* Charles J. Hynes, District Attorney, Kings County, Brooklyn, New York, *for Respondent-Appellee*.

————————

GERARD E. LYNCH, *Circuit Judge*:

A New York jury convicted petitioner-appellant Ellis Wood ("Wood") of Murder in the First Degree for hiring Rasheen Harry ("Harry") to kill Carlisle Hall ("Hall"). A videotaped statement Wood made while in police custody played a central role at trial. On appeal to the New York Supreme Court, Appellate Division, Wood argued that he had made the statement after invoking his right to counsel and, therefore, that its admission at trial violated his Fifth and Fourteenth Amendment rights under Edwards v. Arizona, 451 U.S. 477

2

(1981).[1] The Appellate Division agreed that the statement's admission was erroneous, but found that error harmless. People v. Wood, 835 N.Y.S.2d 414, 415 (2d Dep't 2007). The United States District Court for the Eastern District of New York (Sifton, *J.*) denied Wood's habeas petition on the same grounds. Wood v. Ercole, No. 08-CV-4850, 2009 WL 1652179, at *12 (E.D.N.Y. June 10, 2009). We must now decide whether the statement's admission violated Wood's right to counsel, and, if so, whether that error had a substantial and injurious effect on the jury's verdict.

## BACKGROUND

### I. Investigation and Arrest

On June 2, 2001, Harry entered Ah Wee travel agency in Brooklyn, New York, walked directly up to its owner, Carlisle Hall, and killed him by firing two shots into his chest. A few weeks later, Nisha Bernard ("Bernard"), Wood's ex-girlfriend and Hall's former employee, told police investigators that Wood had hired Harry to commit the

---

[1] The right to counsel is most typically associated with the Sixth Amendment, which guarantees a criminal defendant "the right . . . to have the Assistance of Counsel for his defence." U.S. Const. amend. VI. However, this Sixth Amendment right only attaches during "'critical' stages of the criminal proceedings," Montejo v. Louisiana, 129 S. Ct. 2079, 2085 (2009), and Wood's statement was made before "proceedings" against him even began. Nevertheless, in Miranda v. Arizona, the Supreme Court interpreted the Fifth Amendment "privilege against self-incrimination" to provide additional rights to all suspects undergoing custodial interrogation. 384 U.S. 436, 458, 467 (1966). Among other things, these Fifth Amendment rights entitle a suspect to request the presence of an attorney during custodial interrogation, and require police officers to "scrupulously honor[]" the underlying privilege against self-incrimination protected by that request. Id. at 474, 479. Wood alleges a violation of this Fifth Amendment "right to counsel."

3

crime.  Based on that tip, Detective Charles Arnao ("Arnao") took both Wood and Harry into custody.

Wood spent the night of August 24 inside the 71st precinct.  At a line-up held the following afternoon, a witness identified Wood as the man he saw arguing with Hall ten days before the murder.  Arnao then took Wood to an interrogation room, where Wood, after waiving his rights, provided an account of his activities on the day Hall was murdered.  Arnao transcribed Wood's statement and both men signed the document.

After signing, Arnao asked Wood if he would "go on video."  Wood initially agreed, but then responded: "I think I should get a lawyer."  Arnao immediately said "ok," stopped inquiring into Hall's murder, handed Wood a telephone, and left the room.  When Arnao returned, he heard the tail-end of Wood's conversation, which he believed "sounded more like a friend than a business" call.  Arnao then arranged for video equipment to be brought into the interrogation room.  Shortly thereafter, Assistant District Attorney Mark Pagliuco arrived with a video technician, read Wood his rights, and, in Arnao's presence, recorded a brief interrogation.

On videotape, Wood disavowed any responsibility for the murder, but admitted to arriving at the scene in his green Lexus and recalled hearing two gunshots while purchasing "weed" nearby.  Wood also spoke of a conversation he had with Harry and a

4

third individual, "Damion,"[2] moments before the shooting in which he identified Hall as "the dude that [Bernard] had a problem with," and watched as Harry walked off towards Hall's location. Wood further admitted to giving Harry small amounts of money and marijuana in the days following Hall's murder.

The statement also provided a potential motive for the murder. On the videotape, Wood explained that Hall previously had "filed a complaint against [Bernard]" based on her participation in a fraudulent credit card scheme being run out of the travel agency. Harry, in his own videotaped statement, asserted that Wood, too, was involved in the fraud. Investigators believed that Wood had Hall killed in order to prevent Hall from pursuing fraud charges against him. Based on this evidence, Wood was indicted for Hall's murder.

## II.  Pretrial Hearing

Prior to trial, defense counsel moved to suppress the line-up identification and both statements. He argued that the government unreasonably delayed Wood's arraignment in order to question him "without the presence of counsel" in violation of the New York State Constitution and the Sixth Amendment. However, defense counsel failed to argue that the videotaped statement's admission at trial would violate Wood's Fifth and Fourteenth Amendment rights under Edwards. See Wood, 835 N.Y.S.2d at 414.

---

[2] The record refers to this individual alternatively as "Damon," "Damien," and "Damion." To avoid confusion we use only Damion.

On November 13, 2002, the trial court issued an order suppressing Wood's written statement after concluding that the nearly thirty-hour delay between Wood's arrest and the time he was first read his rights, combined with his informal agreement with Arnao to "speak like men" if he was picked out of the line-up, made this statement "involuntary." Nevertheless, the court admitted Wood's videotaped statement after concluding that the video interrogation was sufficiently attenuated from Arnao's unconstitutional conduct to "purge any taint."[3] The trial court also suppressed the eye-witness identification for the independent reason that "highly suggestive comments" by Arnao indicated the "definite presence" in the line-up of the person the witness had seen arguing with Hall before the murder.

## III.  Wood's Trial

During the brief trial, Harry and Bernard testified to Wood's role in the murder; a few other witnesses detailed Hall's injuries and Harry's actions inside the travel agency. In addition, the government played Wood's videotaped statement, which largely confirmed Harry's version of events leading up to the shooting.  The only real question before the jury was whether Wood hired Harry to kill Hall or Harry simply took it upon himself to do so.  As a result, the prosecution's case rested on Harry's and Bernard's credibility.

---

[3] Although the trial court did not address the Fifth Amendment issue, it did refer, in passing, to Wood's "equivocal comment about his need for an attorney."

A.  Testimony of Rasheen Harry

According to Harry, Wood approached him on the morning of June 2 and asked if he "want[ed] to make some money."  Wood explained that "some man had raped [Bernard]," and implied that he sought revenge.  Harry, twenty-five years old and fresh out of prison, was interested.

The pair traveled together in Wood's white Lexus, presumably to find the man in question.  While stopped to change vehicles, Wood told Harry that he wanted him "to kill somebody."  Harry agreed, and they drove together towards the travel agency in Wood's green Lexus.  Soon after arriving, Wood saw Hall walk by on his way to work  and Wood identified him to Harry as "the man that raped [Bernard]."  Wood then got out of the car to "go buy some weed" and gave Harry twenty dollars to purchase something to eat.  Upon Wood's return, Harry entered the travel agency and shot Hall twice in the chest.  He then passed the gun off to Damion, who was waiting "by the train," and left the scene.

Three days later, Harry called Wood asking for money.  Wood told Harry to go to a local store owned by Juanchi Hildago ("Hildago").  There, Hildago lent Harry ten dollars.  This represented half of the twenty dollars Harry received between the shooting and his arrest.  Though Harry claimed Wood had initially offered him $500 for the murder, Harry testified that the subject was never again discussed and payment was never made.  In fact, Harry testified that "it wasn't like [Wood] really owed [him the $500]."

7

Defense counsel's cross examination focused squarely on Harry's credibility. It targeted his lengthy criminal history, his multiple conflicting accounts of the crime, and his incentive to implicate others to obtain leniency.

B. Testimony of Nisha Bernard

The prosecution called Bernard as its final witness. Bernard explained that she and Wood often argued. Bernard's mother sparked a particularly intense fight a few weeks after Hall's death by calling Wood "a murderer." In the heat of that argument, Wood told Bernard that "he could get the same person that killed [Hall] to do the same thing to [her]." Approximately two weeks later Wood shared details of Hall's murder with Bernard and admitted to orchestrating the killing.

Bernard also testified to witnessing a phone call that Wood received from Harry, after which Wood explained that the caller was Hall's killer and that he was asking for money. Bernard then accompanied Wood to Hildago's store, where Wood gave Harry a small amount of cash. Soon after, Bernard contacted the officers investigating the credit card scam and informed them of Wood's role in the murder.

On cross examination, defense counsel noted Bernard's involvement in the credit card scheme and continued contact with Wood even after his arrest, implying that Bernard testified to prevent further charges from being brought against her, even though she never believed Wood was involved in the murder. Bernard also admitted to feeling

anger towards Wood.  Defense counsel implied that this, and the couple's frequent quarrels, gave her reason to implicate Wood in Hall's murder.

    C. <u>Closing Arguments and the Jury's Verdict</u>

Wood's defense was that Harry took it upon himself to kill Hall and then fingered Wood in an attempt to secure leniency.  However, the admission of Wood's videotaped statement forced defense counsel to affirm that the events it depicted were for the most part "the way it was."  This severely strained the argument that Harry acted independently of Wood and complicated efforts to undermine Harry's credibility, because Wood's own statement placed him at the scene, mere moments before the shooting, and acknowledged that he identified Hall to Harry at that time and place as someone Bernard "had [a] beef with."  Nevertheless, defense counsel's summation attempted to discredit the government's key witnesses and paint Harry as a senseless killer.

The prosecutor, in turn, began his summation by characterizing Wood's statement as an attempt "to explain away his presence at the crime scene."  He noted that Wood knew both the victim and the shooter, but failed to contact the police after the killing.  This demonstrated Wood's guilt, he argued, because "any citizen" would have come forward with such information.  The prosecutor then focused squarely on the content of Wood's videotaped statement, arguing that it corroborated Harry's version of events up to the moment of the shooting and, therefore, bolstered the credibility of Harry's entire testimony.  To reinforce that point, the prosecutor used details from Wood's statement –

9

the color and make of his car, the number of shots fired, Wood's purchase of marijuana directly before the shooting – to confirm details from Harry's testimony. The prosecutor thus used the statement in an effort to make the jury more likely to credit Harry's version of the actual killing once the stories diverged.

The prosecutor also directly confronted Wood's theory of the case by rejecting the idea of a "senseless" murder. He insisted that Harry was "not some madman. . . . [He was] motivated in life by money." This led the prosecutor to further emphasize Wood's admission that he gave Harry cash and drugs shortly after the murder. He argued: "What possible explanation is there for that? Other than that [Harry] was somehow entitled to that money . . . . There is no other explanation for it."

On the third day of deliberations, the jury found Wood guilty of Murder in the First Degree, concluding that he had hired Harry to kill Hall. See N.Y. Penal Law § 125.27(1)(a)(vi).

## IV. Wood's Appeals

Wood appealed his conviction to the Appellate Division of the New York Supreme Court, claiming that the admission of his videotaped statement violated his Fifth and Fourteenth Amendment right to counsel. Wood, 835 N.Y.S.2d at 414. The Appellate Division held that the admission of Wood's statement violated his constitutional rights, but concluded that the error was harmless. Id. at 414-15. Wood's application for leave to appeal to the New York Court of Appeals was denied. People v. Wood, 844 N.Y.S.2d

10

182 (2007).

On November 25, 2008, Wood petitioned for a writ of habeas corpus in the Eastern District of New York. See 28 U.S.C. § 2554. The district court agreed with Wood and the Appellate Division that Wood's statement "I think I should get a lawyer" was an "unequivocal" invocation of counsel and, therefore, that his videotaped statement should have been suppressed. Wood, 2009 WL 1652179, at *8. Nevertheless, like the state appellate court, it determined that the error "did not have a substantial and injurious effect or influence in determining the jury's verdict" and was therefore harmless. Id. at *12 (internal quotation marks omitted). This appeal followed.

## DISCUSSION

A prisoner held "pursuant to the judgment of a State court" may petition the federal courts for a writ of habeas corpus "on the ground that he is in custody in violation of the Constitution or laws or treaties of the United States." 28 U.S.C. § 2254(a).[4] This Court reviews de novo a district court's denial of a petition for habeas corpus. Zappulla

---

[4] Respondent-appellee Robert Ercole ("Appellee"), the Superintendent of the Green Haven Correctional Facility, raises no procedural objection to our reaching the merits of Wood's habeas petition. As the district court found, the petition was timely under 28 U.S.C. § 2244(d). Furthermore, although Wood raised his Edwards claim for the first time before the state appellate court, Wood, 835 N.Y.S.2d at 414, New York law permits "a claim that a defendant was deprived of his right to counsel during police questioning [to] be raised for the first time on appeal," People v. Samuels, 424 N.Y.S.2d 892, 894 (1980). Therefore, no procedural bar prevents Wood from raising his Edwards claim in federal habeas. Similarly, by presenting this claim to the state appellate courts, Wood met the exhaustion requirement mandated by 28 U.S.C. § 2254(b)(1)(A).

11

v. New York, 391 F.3d 462, 466 (2d Cir. 2004); Lurie v. Wittner, 228 F.3d 113, 121 (2d Cir. 2000).

## I. Constitutional Violation

We must first determine whether the state appellate court correctly concluded that admitting the videotaped statement violated Wood's right to counsel. Binding precedent is clear: once a suspect requests counsel, all interrogation must stop until an attorney is provided or the suspect reinitiates conversation. Davis v. United States, 512 U.S. 452, 458 (1994); see also Maryland v. Shatzer, 130 S. Ct. 1213, 1219 (2010); Edwards, 451 U.S. at 485-87; Miranda v. Arizona, 384 U.S. 436, 474 (1966). This important "prophylactic rule [is] designed to prevent police from badgering a defendant into waiving his . . . rights." Michigan v. Harvey, 494 U.S. 344, 350 (1990); see also Montejo v. Louisiana, 129 S. Ct. 2079, 2085 (2009); United States v. Quiroz, 13 F.3d 505, 510 (2d Cir. 1993).[5] Evidence collected in violation of a suspect's right to counsel is inadmissible as part of the prosecution's case-in-chief. See Miranda, 384 U.S. at 494; United States v. Morales, 788 F.2d 883, 885 (2d Cir. 1986).

There is no question that Wood's videotaped statement was taken after he stated, "I think I should get a lawyer." To invoke the right to counsel, however, a suspect must

_____

[5] In Davis, the Supreme Court held that a defendant who validly waives his Fifth Amendment rights and thereafter seeks to reassert them bears the burden of demonstrating that his subsequent invocation was unambiguous. 512 U.S. at 460-62; see also United States v. Plugh, 576 F.3d 135, 142 (2d Cir. 2009). Appellee does not challenge the state court's determination that Wood's initial waiver was involuntary and, therefore, the burden remains on the Appellee to show valid waiver. Plugh, 576 F.3d at 143.

speak clearly enough "that a reasonable police officer in the circumstances would understand the statement to be a request for an attorney." Davis, 512 U.S. at 459. "[A]mbiguous or equivocal" requests are insufficient. Id. Appellee argues that Wood's statement was insufficient to "actually invoke[] his right to counsel" and therefore did not trigger Edwards's "rigid prophylactic rule." Id. at 458 (emphasis and internal quotation marks omitted). We disagree.

Wood clearly expressed his belief that, before making a videotaped statement, he should speak with an attorney. As Arnao testified, Wood "asked for a lawyer." Wood's language was unambiguous: he did not say "*perhaps* I should get a lawyer" or "*maybe* I need a lawyer."[6] The statement "I think I should get a lawyer" evidences no internal debate whatsoever. Though Wood may have used a few extra words, we refuse to require criminal defendants to "speak with the discrimination of an Oxford don," Davis, 512 U.S. at 476 (Souter, J., concurring in judgment), in order to invoke their right to counsel.

The circumstances surrounding the interrogation erase any possible ambiguity. Cf. United States v. Plugh, 576 F.3d 135, 142 (2d Cir. 2009). The police held Wood for more than twenty-four hours before taking his statement. During that time, investigators confronted Wood with various interrogation techniques and, up until the moment Arnao suggested a videotaped confession, Wood complied with their every request.

---

[6] Unlike the statement in Davis, where the petitioner indicated an internal debate about whether or not to invoke his right to counsel by using the word "maybe," 512 U.S. at 455, Wood's request contained no vacillation of any kind.

13

Nevertheless, faced for the first time with the prospect of being recorded, Wood expressed a desire for counsel. Had there been any ambiguity in Wood's statement, Arnao could have eliminated it by asking a clarifying question designed to ferret out Wood's true intent. See Davis, 512 U.S. at 455, 461; Plugh, 576 F.3d at 140-41. Arnao found such inquiry unnecessary: he simply said "ok," handed Wood a telephone, and left the room (presumably to permit a more private conversation between counsel and client). As Arnao seemingly recognized, and both the state appellate court and the federal district court found, Wood's actions constituted an unambiguous request for counsel.

Nevertheless, Appellee claims that the words "think" and "should" somehow qualify Wood's statement, rendering it insufficient to invoke Fifth Amendment protections. As the Eleventh Circuit has found, those words do not undermine a request for counsel. See Cannady v. Dugger, 931 F.2d 752, 755 (11th Cir. 1991) (concluding that phrase "I think I should call my lawyer" was "an unequivocal request for counsel"). Absent special circumstances, a reasonable observer hearing the phrase "I think we should go to a movie" would not believe that the speaker actually wanted to stay home or go to a baseball game, or that the speaker was engaged in an internal debate rather than expressing a preference.

While "I think I should get a lawyer" could theoretically be uttered with such inflection and emphasis so as to alter its plain meaning,[7] Arnao's response forecloses that

---

[7] If any potential for ambiguity exists, it comes from the phrase "I think." While the phrase implies a current understanding or desire, its context determines the strength of that conviction. Compare William Shakespeare, Timon of Athens act 1, sc. 2 ("I wonder men

14

possibility here.  See Abela v. Martin, 380 F.3d 915, 926 (6th Cir. 2004) ("Although our inquiry is an objective one, [the interrogating officer's] actions confirm that a reasonable officer would understand [petitioner's] statement to be a clear request for counsel." (internal citation omitted)).  Taking Wood's language at face value, Arnao immediately handed over a phone so that Wood could call an attorney.  Nothing in the record indicates that this was anything other than a reasonable response to objectively clear language indicating that Wood thought counsel was necessary before giving a videotaped statement.  See id. ("[L]anguage that might be less than clear, when viewed in isolation, can become clear and unambiguous when the immediately surrounding circumstances render them so.").[8]

---

dare trust themselves with men: / Methinks they should invite them without knives; / Good for their meat, and safer for their lives.") and William Shakespeare, The First Part of Henry the Sixth, act. 3, sc. 1 ("Methinks my lord should be religious, / and know the office that belongs to such.") with id. act 5, sc. 3 ("And yet, methinks, I could be well content / To be mine own attorney in this case.").  In various contexts, "I think" could be part of an emphatic assertion of the right to counsel, as in "*You* want me to talk, but *I* think I should get a lawyer," or it could be subsumed into an ambiguous statement, as in "I *think* I should get a lawyer, *but* I'm not sure."  It also could be little more than throat clearing, designed to show proper deference to an authority figure, as in "I think I'll just call my lawyer now."  Similarly, emphasis plays a role: "I think I *should* get a lawyer" more strongly asserts the right to counsel than does "I *think* I should get a lawyer."  Nevertheless, where, as here, the immediate circumstances indicate that the speaker intended his words' plain meaning, it would be inappropriate for us to graft our own emphasis onto the language.  Since a literal, uninflected reading of "I think I should get a lawyer" expresses a belief that counsel is needed, and Arnao, himself, testified that Wood "asked for a lawyer," we cannot say that the state appellate court erred in interpreting it that way.

[8] That Arnao believed Wood called a friend, rather than an attorney, is irrelevant. First, most people do not carry a lawyer's phone number with them, and so they must reach out to a friend or family member for assistance in locating counsel. Second, Arnao does not purport to have heard, or to be able to report, the substance of Wood's call; even if the content of the call were relevant, which it is not, Arnao's impression that Wood was speaking

15

At bottom, Appellee's argument amounts to the claim that Wood was not insistent enough. Perhaps "I demand a lawyer" would have resolved any inkling of doubt, but we cannot fault Wood for being polite and calm, rather than querulous and aggressive. His statement was unequivocal; it need not have been forcefully made. We therefore agree with the unanimous conclusion of all five judges who have expressly reviewed this issue, and conclude that Wood's interrogators had an obligation to stop all questioning after Wood unambiguously asserted his right to counsel. Because the videotaped statement was made after this duty attached, its admission at trial violated Wood's Fifth and Fourteenth Amendment rights.

## II. Harmlessness

### A. Standard of Review

The conclusion that Wood's statement should not have been admitted does not end our inquiry. The erroneous admission of a defendant's statement in violation of his right to counsel is subject to harmless error analysis. Arizona v. Fulminante, 499 U.S. 279, 310 (1991); Perkins v. Herbert, 596 F.3d 161, 174 (2d Cir. 2010); Zappulla, 391 F.3d at 466. State appellate courts conducting harmlessness review of trial court errors must find a constitutional error "harmless beyond a reasonable doubt" before affirming a conviction. Chapman v. California, 386 U.S. 18, 24 (1967). On habeas review of state

---

to a friend would provide no useful insight into the substance of the conversation. Third, events occurring minutes *after* an unequivocal invocation of counsel are irrelevant: all interrogation must stop until counsel is provided or conversation is reinitiated by the suspect. Here, counsel was not provided and there is no allegation that Wood reinitiated the interrogation.

court convictions, federal courts apply a less stringent standard. We have expressed some uncertainty, however, as between two ways of formulating that standard. See Perkins, 596 F.3d at 175-76.

The Supreme Court announced the first approach in Brecht v. Abrahamson, 507 U.S. 619 (1993). Brecht permits federal courts to overturn a state conviction only when the constitutional violation "had substantial and injurious effect or influence in determining the jury's verdict." Id. at 637 (internal quotation marks omitted). The Brecht standard incorporates the interests of "finality . . . comity and federalism" applicable to habeas review and is therefore "less onerous" than the Chapman "harmless beyond a reasonable doubt" standard applied on direct review. Id. at 635-37.

In 1996, however, Congress amended 28 U.S.C. § 2254 to limit federal habeas relief to individuals incarcerated under state court decisions "contrary to, or involv[ing] an unreasonable application of" Supreme Court precedent. See 28 U.S.C. § 2254(d)(1). This gave rise to the second approach, which requires federal courts to "assess whether the state appellate court acted reasonably in determining that the error was 'harmless . . . beyond a reasonable doubt'" under Chapman. Perkins, 596 F.3d at 175, quoting Mitchell v. Esparza, 540 U.S. 12, 17-19 (2003).

Faced with these competing approaches, this Court recently stated that "[w]here a state appellate court has found that a state trial court committed a constitutional violation but has held that the violation was harmless, the standard of review for a federal court conducting habeas corpus review has not yet been clearly established." Perkins, 596 F.3d

17

at 175. And because the two approaches rarely produce different results, we have yet to settle the issue. Id. at 176. But see Gutierrez v. McGinnis, 389 F.3d 300, 306 (2d Cir. 2004) (holding "that when a state court explicitly conducts harmless error review . . . a habeas court must evaluate whether the state unreasonably applied Chapman").

However, a recent Supreme Court decision appears to have settled the debate. In Fry v. Pliler, the Court held that "in § 2254 proceedings a court must assess the prejudicial impact of constitutional error in a state-court criminal trial under the 'substantial and injurious effect' standard set forth in Brecht . . . whether or not the state appellate court recognized the error and reviewed it for harmlessness." 551 U.S. 112, 121-22 (2007). The Supreme Court made clear that "it certainly makes no sense to require formal application of *both* tests ([]Chapman and Brecht) when the latter obviously subsumes the former." Id. at 120. In concert with nearly all of our sister courts,[9] we

---

[9] See, e.g., Vining v. Sec'y, Dep't of Corr., 610 F.3d 568, 571 (11th Cir. 2010) (applying Brecht to assess state court's harmlessness determination); Welch v. Workman, 607 F.3d 674, 686 (10th Cir. 2010) ("[The state court] determined the admission of the statement was harmless error. Therefore, we review only whether the admission of the testimony is harmless under the Brecht standard."); Ruelas v. Wolfenbarger, 580 F.3d 403, 412 (6th Cir. 2009) ("The answer in this Circuit is that Brecht is always the test, and there is no reason to ask both whether the state court 'unreasonably' applied Chapman . . . and . . . whether the constitutional error had a 'substantial and injurious' effect on the jury's verdict."); Jackson v. Norris, 573 F.3d 856, 858 (8th Cir. 2009) (citing Fry and Brecht for the proposition that federal courts conducting habeas corpus review "may not grant relief unless the state trial error had a 'substantial and injurious effect or influence in determining the jury's verdict.'"); Foxworth v. St. Amand, 570 F.3d 414, 435 (1st Cir. 2009) ("The Supreme Court recently instructed federal habeas courts to perform a straightforward harmless error analysis under Brecht . . . rather than review a state court's harmless-beyond-a-reasonable-doubt determination for unreasonableness."); Bond v. Beard, 539 F.3d 256, 275-76 (3rd Cir. 2008) ("Fry instructs us to perform our own harmless error analysis under Brecht . . . ."); Burbank v. Cain, 535 F.3d 350, 356-57 (5th Cir. 2008) (Brecht "subsumes" the unreasonable

18

conclude that the "unreasonable application of <u>Chapman</u>" standard does not survive <u>Fry</u>.

Where the Supreme Court has given clear instruction as to the standard to be applied, it is

our responsibility to follow that instruction and apply that standard.

B.  <u>The Harmlessness Calculation</u>

In assessing "whether the erroneous admission of evidence had a substantial and

injurious effect on the jury's decision, [we consider] the importance of the . . . wrongly

admitted [evidence], and the overall strength of the prosecution's case."  <u>Wray v.</u>

<u>Johnson</u>, 202 F.3d 515, 526 (2d Cir. 2000), citing <u>Brecht</u>, 507 U.S. at 639.  The

importance of wrongly admitted evidence is determined by "the prosecutor's conduct

with respect to the . . . evidence," <u>Zappulla</u>, 391 F.3d at 468, whether the evidence "bore

on an issue . . . plainly critical to the jury's decision," and "whether [it] was material to

the establishment of the critical fact, or whether it was instead corroborated and

cumulative," <u>Wray</u>, 202 F.3d at 526 (internal quotation marks omitted).

1.  <u>The Prosecution's Case Was Not Strong</u>

The strength of the prosecution's case, absent the erroneously admitted evidence,

"is probably the single most critical factor in determining whether [the] error was

harmless."  <u>Latine v. Mann</u>, 25 F.3d 1162, 1167-68 (2d Cir. 1994) (internal quotation

marks omitted); <u>see</u> <u>also</u> <u>Wray</u>, 202 F.3d at 526.  This factor favors Wood.

---

under <u>Chapman</u> standard); <u>Golphin v. Branker</u>, 519 F.3d 168, 190 (4th Cir. 2008) (<u>Brecht</u> applies whether or not the state court made its own harmlessness determination).  <u>But</u> <u>see</u> <u>Johnson v. Acevedo</u>, 572 F.3d 398, 404 (7th Cir. 2009) (applying both approaches where the state appellate court conducted its own harmless-error analysis).

19

Putting aside the videotaped statement, only Bernard's and Harry's testimony directly linked Wood to the crime. As a result, the prosecution's case rested squarely on their credibility. Unfortunately for the prosecution, both of these witnesses were heavily impeached. See Zappulla, 391 F.3d at 468-71 (determining prosecution's case was weak in part because its witnesses lacked credibility). The prosecutor acknowledged as much during summation by admitting that Harry and Bernard "[lacked] clean hands," and the record bears him out.

Harry is the archetypal miscreant: a frequent drinker and drug abuser who spent his teenage years in and out of jails, prisons, and gangs. He testified to killing a total stranger for a promise of a few hundred dollars and admitted to lying to investigators in this very case. By trial's end, four of Harry's contradictory statements were before the jury. These statements alternatively claimed that (1) Wood shot Hall, (2) Wood forced Harry to shoot Hall, (3) Wood paid Harry to shoot Hall, and (4) Wood had nothing to do with Harry's independent decision to shoot Hall.

In addition to this troubling criminal record and direct evidence of fabrication, Harry admitted to committing perjury in a previous unrelated trial.[10] Moreover, the plea

___

[10] Defense counsel elicited the following testimony from Harry regarding one of Harry's previous convictions for possession of crack cocaine:

> Q: When you took the stand on your own behalf, you were in a court of law?
> A: Yeah.
> Q: And a courtroom pretty much like this?
> A: Similar. I was on the ninth floor in this building.
> Q: And before you testified to the people on the jury, you were sworn to tell the truth, weren't you?

20

agreement that secured Harry's testimony in this case permitted him to escape life in prison, illustrating vividly for the jury his powerful incentive, once identified as Hall's killer, to seek leniency by implicating others. Under these circumstances, a jury would be unlikely to credit Harry's version of events absent strong corroboration. See United States v. Riggi, 541 F.3d 94, 105 (2d Cir. 2008) (noting "jury's reluctance" to rely on "cooperating witness testimony"). In a case fundamentally about whether the jury believes the shooter or his alleged patron, Harry's credibility problems greatly undermine the strength of the prosecution's case.

Bernard's credibility was also compromised. She had the very same reason to testify against Wood as Wood had to kill Hall: both sought to head off any prosecution related to the fraudulent credit card scheme. Prosecution for that fraud was particularly hazardous for Bernard, who was not a legal resident and could have faced deportation. In

---

A: Yeah.
Q: Yes?
A: Yeah.
Q: You raised your hand and said you would tell the truth, the whole truth, and nothing but the truth, right?
A: Yeah.
Q: You were sitting about as far from the people in that jury box as you are sitting from the people in this jury box?
A: Uh-huh.
Q: And you got up and you looked at them and you lied to them, didn't you.
A: Yeah.

While the dissent characterizes Harry's admitted willingness to murder a total stranger "for no motive other than Wood's promise of some money" as "the most seriously damaging behavior to which [he] admitted at trial," Dissenting Op. at 9, there can be no doubt that Harry's credibility was also severely damaged by his admitted willingness to lie on the witness stand.

21

addition, her admitted role in this crime of dishonesty made the rest of her testimony less credible.

Bernard also lacked direct knowledge of the events leading to the murder.[11] Instead, her trial testimony primarily reported statements Wood allegedly made to her after the fact, often in the heat of an argument. The force of that testimony, however, was blunted by the fact that, even after Wood shared his account of Hall's murder, Bernard admitted that she still did not believe that Wood had a role in the killing. In fact, Bernard visited Wood in prison right up to the time of trial.

The dissent insists that, taken together, the testimony of Bernard and Harry created a strong case for the prosecution because that testimony "clearly established Wood's role in the murder-for-hire of the victim Carlisle Hall." Dissenting Op. at 19. But this

---

[11] The dissent claims that "the only explanation in this record" for Bernard's knowledge of "details about the killing" is that Wood related them to her. Dissenting Op. at 2, 9, 10, 15, 16. We disagree. Harry testified to informing the authorities that he shared details of the killing with his girlfriend. Of course, the jury was free to believe that that conversation never occurred, and instead credit Harry's testimony that he had merely lied to the police about communicating with his girlfriend. But the possibility that Harry told his girlfriend about the murder, combined with the fact that Bernard's mother had independent knowledge of the killing just a few hours after it occurred, indicates that information about the shooting had quickly spread throughout the neighborhood. Hall, after all, was killed on a Saturday afternoon in the middle of Brooklyn and in front of at least two witnesses besides Harry.

Certainly the vast majority of the specific details to which Bernard testified – the number of shots fired, the clothes Hall was wearing that day, and the description of the travel agency employee who had accompanied Hall into the store – would have been readily known by anyone at the scene. Absent Wood's videotaped statement, the defense could therefore have argued that Bernard came to know details of the killing based on gossip, rather than through Wood. However, the admission of Wood's videotaped statement at trial, which placed Wood at the scene of the crime and corroborated many of the details testified to by Harry and Bernard, foreclosed that argument.

22

assumes that the jury would believe these two witnesses – a cooperating gunman and a disgruntled ex-girlfriend – absent the corroborating force of Wood's videotaped statement. Our dissenting colleague persuasively explains why *she* would choose, if a juror, to believe these witnesses, despite the ample grounds for impeachment. But it is not for us to decide whether we think that *we* would have voted to convict. The question, rather, is whether the erroneous admission of Wood's statement had a substantial and injurious effect on *the jury's* decision. It was for the jury to decide the credibility of the witnesses, and absent the impact of the statement, they may very well not have seen that issue in the same light as does the dissent.

After a trial lasting less than one week, the jury – even armed with Wood's statement – deliberated into its third day before reaching consensus. This "indicat[ed] a difference among them as to [Wood's] guilt." Parker v. Gladden, 385 U.S. 363, 365 (1966); see also Zappulla, 391 F.3d at 471 (noting "full day" deliberation "in a straightforward single-count case" meant "that a conviction was not assured"). Without the statement, and, therefore, with a substantially weaker case, a guilty verdict would be far from assured.

### 2. Wood's Videotaped Statement Was an Important Piece of Evidence

As Appellee conceded at oral argument, Wood's videotaped statement was a "significant piece of evidence." The prosecution's heavy reliance on the videotape during summation exposed its central role in persuading the jury to convict, and our review confirms its importance.

23

While not a true confession, Wood's statement contained many highly-damaging admissions that plainly bore on issues central to the jury's decision. In it, Wood acknowledged his presence at the scene of the crime and conceded that he identified Hall to Harry and Damion as the "sucker" Bernard was having problems with. In the words of Wood's prosecutor, "that's a biggie." Wood further admitted to giving Harry "$20 when [he] had the money" as well as "a bag of weed and a couple of dollars" one evening at Hildago's store. Certainly, Wood's admission that, after the murder, he gave money and drugs to the shooter would be critical to the jury's determination of whether Wood hired Harry to kill Hall in the first place. It is no wonder, then, that the jury asked to view the videotaped statement during its deliberations.

Furthermore, as Appellee conceded at oral argument, Wood's statement "locked [him] into" an implausible and highly incriminating depiction of the shooting. This created two problems for the defense: first, it forced Wood to defend a plainly absurd version of events, and second, by confirming much of Harry's and Bernard's testimony, Wood's own statement crippled defense counsel's ability to argue that Harry and Bernard should not be believed.

Wood's videotaped statement strains credibility. In it, he purports to have simply stumbled upon Hall outside the travel agency, though he explains neither his own presence there nor the remarkable coincidence of meeting Harry at a nearby gas station. What's more, Wood denies any "hard feelings" towards Hall, despite claiming to believe

24

that Hall sexually harassed Bernard, his girlfriend at the time, and had her arrested for grand larceny. Nevertheless, he admits to identifying Hall to Harry as "the sucker" Bernard had a problem with. And, although Wood claims to barely know Harry, Wood insists that that statement alone prompted Harry, on his own motion, to kill.

In addition to locking Wood into a dubious version of events, the statement significantly bolstered the prosecution's case. Because Wood never admitted to hiring Harry to kill Hall, the central question for the jury was whether to credit Harry's testimony on that issue, despite his otherwise suspect character. Harry's trial testimony is not intrinsically persuasive, and it was only one of the four different versions of events that he gave to the police. Yet Wood's statement essentially confirmed every aspect of Harry's story, save the critical detail of Wood's solicitation of the murder. The statement was thus devastating to the defense argument that Harry was an irresponsible fabricator.

The prosecutor clearly understood that Wood's statement was a powerful weapon in persuading the jury to credit Harry's trial testimony. As a result, his summation led with and focused on the videotaped statement.[12] In fact, the first twenty of the summation's fifty pages are dedicated almost exclusively to the statement, and to the role the prosecutor hoped it would play in the jury's deliberations. See Zappulla, 391 F.3d at

---

[12] The fact that the statement was not merely paraphrased by a police witness but videotaped is not without significance in assessing its impact on the jury. That Wood had made the statement was beyond challenge since, as the prosecutor highlighted in summation, the jury "saw the tape." Even more important, the visual impression of Wood directly admitting some key incriminating facts and arguably equivocating about others must have had a powerful effect on the jury.

25

471 (recognizing that the "prosecution knows intimately the strengths and weaknesses of its case," and relying on fact that "the prosecutor found the erroneously admitted evidence to be important" in its harmlessness calculation).

The prosecutor began his summation by telling the jury that understanding the case "as a whole . . . *starts with* . . . the statement of Mr. Wood." (emphasis added.) He then proceeded to systematically link each assertion Wood made to the testimony of Harry and Bernard. For example, after reminding the jury that Harry testified to driving with Wood to the travel agency in a green Lexus, meeting Damion, and watching Hall enter the store with another individual, the prosecutor stated:

> Is [Harry] lying about any of those things? No. Mr. Wood admits each and every one of those things happened. Mr. Wood admits to knowing [Harry]. He admits to bringing [Harry] to that store after they met up at the gas station. Again, Mr. Harry, is he a liar? Is he making this up? No, it's confirmed by [Wood].

Using Wood's own words, the prosecutor buttressed the claims of his witnesses. In fact, he explicitly argued this point to the jury:

> Now, [Wood's statement] is[] not a confession. He doesn't say "I committed murder." He doesn't say "I paid Rasheen Harry to kill . . . Carlyle [*sic*] Hall." Far from it. It's not a confession.
> But, what it is . . . is a series of very interesting admissions, if you will, statements of fact that he says that should have sounded very, very familiar to you from the testimony of Rasheen Harry and the testimony of Nisha Bernard.
> Why is that important, ladies and gentlemen? Because one of the things the Judge is going to tell you about as to whether you believe a person or not is not just what their

26

background is, but it's whether their statements are corroborated by other facts.

Harry and Bernard are believable, the prosecutor argued, precisely because Wood said they were.

We do not suggest that the prosecutor improperly emphasized Wood's statement to the jury. Quite the opposite: since the statement was admitted into evidence, the prosecutor had every right to rely on it in summation, and like a skilled advocate he focused the jury's attention on the strengths of his case. In so doing, however, he revealed his belief about the impact Wood's statement would have on the jury. That the prosecutor found Wood's statement so significant confirms our belief that it was, in fact, central to the prosecution's case. See Satterwhite v. Texas, 486 U.S. 249, 260 (1988) (focusing, in part, on "significant weight" prosecution's summation placed on wrongfully admitted testimony in determining harmlessness). Any experienced trial lawyer would understand that a case that is close with only the testimony of Harry and Bernard becomes much stronger when Wood's statement is added. That is undoubtedly why the prosecutor gave the statement such a prominent place in his closing argument.

Appellee argues that Wood's statement was "entirely cumulative" because the factual statements it contained were repetitive of Bernard's and Harry's testimony, and therefore contends that its admission at trial was harmless. To characterize this statement as "cumulative" would give that term an excessively broad and unrealistic meaning. The question is not whether the content of an erroneously admitted statement was otherwise

27

before the jury, but whether the erroneously admitted evidence "filled . . . a missing link" in the government's case. <u>Zappulla</u>, 391 F.3d at 472. Here, the statement did not simply confirm facts that were decisively proven by other evidence. Rather, it went to the heart of the central, hotly disputed issue in the case: whether the jury should believe Harry's account of the crime.

The prosecution's case was based on the testimony of two questionable witnesses: Harry, the admitted shooter, testifying to secure a lighter sentence, and Bernard, Wood's former girlfriend, who testified in the face of a potential prosecution for credit card fraud and possible deportation. The critical question for the jury was whether these witnesses were credible. The prosecution benefitted greatly by corroborating their testimony with independent evidence, from Wood's own mouth, of Wood's involvement in the murder. By reinforcing Harry's and Bernard's version of events, Wood's statement solved the credibility problem.

The prosecutor honed in on this point when he urged the jury to make credibility determinations based on whether the testimony was "corroborated by other facts." The "other facts" to which he directed the jury were those contained in Wood's statement, which was the only evidence the prosecutor relied on to support Harry's and Bernard's testimony. In a case such as this one, where guilt rests on witness credibility, key evidence affecting credibility is not merely corroborative or cumulative: by permitting the jury to credit otherwise suspect testimony, it provides a key link in the prosecution's case.

28

C.  The Error Was Not Harmless

When a reviewing court has "grave doubt about whether a trial error . . . had 'substantial and injurious effect or influence in determining the jury's verdict,' that error is not harmless.  And, the petitioner must win."  O'Neal v. McAninch, 513 U.S. 432, 436 (1995); see also Wray, 202 F.3d at 525-26.  Here, where the wrongfully admitted evidence was an inculpatory statement by the defendant central to the prosecution's case, we can confidently say that the error was not harmless.

**CONCLUSION**

For the foregoing reasons, we hereby REVERSE the district court's denial of Wood's petition, and REMAND back to the district court with instructions to grant the writ unless the State provides a new trial within a reasonable period.[13]

---

[13] Although some of our cases have spoken of vacating the state conviction upon granting habeas, see, e.g., Zappulla, 391 F.3d at 464, 475; Ramirez v. Jones, 683 F.2d 712, 718 (2d Cir. 1982), this Court only has the power to act on the body of the prisoner, not on the conviction itself, see Fay v. Noia, 372 U.S. 391, 430-31 (1963) ("Habeas lies to enforce the right of personal liberty; when that right is denied and a person confined, the federal court has the power to release him.  Indeed, it has no other power; it cannot revise the state court judgment; it can act only on the body of the petitioner."), overruled on other grounds by Wainwright v. Sykes, 433 U.S. 72 (1977); Gentry v. Deuth, 456 F.3d 687, 697 (6th Cir. 2006); Wilson v. Lawrence County, Mo., 154 F.3d 757, 761 (8th Cir. 1998); 39A C.J.S. Habeas Corpus § 387 ("A federal writ of habeas corpus binds state courts, insofar as it mandates a state prisoner's release from custody, but it does not vacate the judgment of conviction . . . .").

DEBRA ANN LIVINGSTON, *Circuit Judge*, dissenting:

On June 2, 2001, Carlisle Hall, the owner of the Ah Wee Travel Agency on Utica Avenue in Brooklyn, was shot twice in the chest at his place of business, resulting in his death. He was killed by Rasheen Harry, a 25-year old who had been released from jail just days before and who had never heard of Hall until the day of the murder. Harry undisputedly did the killing, but based on the evidence at Ellis Wood's trial, Harry did not instigate this crime. It was the 41-year old Wood, Harry's neighbor from Lincoln Road, who commissioned it. Wood offered to pay Harry (with whom he "[hung] out on the block" and drank Hennessy during the time they both lived on Lincoln Road) $500 for doing the deed, falsely informing Harry that he, Wood, wanted Hall dead because Hall had raped Wood's girlfriend, Nisha Bernard, a former employee of the Ah Wee Travel Agency. It was Wood who drove Harry to the travel agency in Wood's green Lexus and who sat in the car outside the agency with his young associate, pointing out the victim as Hall strolled down the street with a colleague, George Radix. Finally, it was Wood who provided Harry with the gun that he carried as he walked inside the travel agency. Moments later, the 59-year-old Carlisle Hall, the principal at the Ah Wee Travel Agency for almost 20 years, had been fatally wounded.

The majority characterizes the case against Wood — which it analyzes, I believe, too casually and without regard to the record as a whole — as "not strong." I disagree. Harry, testifying pursuant to a cooperation agreement that nevertheless provided for his incarceration from 20 years to life, identified Wood as the person who set this crime in motion — providing him with a gun and identifying Hall as the victim — and testified to receiving money for his role after the fact at "Juanchi's" store — also known as the One Love Culture Shop in Brooklyn. This accomplice

1

testimony was not just supported but *fully* corroborated by Wood's girlfriend, Bernard, who testified, in substance, that Wood *admitted* to her that he had arranged for the murder to be committed — and to be committed *by an acquaintance from Lincoln Road*.

There is no evidence — none — that Bernard ever met or even knew of Rasheen Harry prior to the crime. Crucially, moreover, Bernard, who reached out to law enforcement authorities to report Wood's involvement soon after he threatened during a fight that "he could get the same person that killed [Hall] to do the same thing to [Bernard] or [her] family," knew details about the killing for which the only explanation in this record is the one she provided — namely, that Wood related them to her. Thus, Bernard, who was not present at the scene, knew the identity of the man, George Radix, with whom Hall walked into his store immediately prior to being shot. She knew, as well, that Hall was wearing brown pants and a burgundy shirt, that he was shot twice, and that, just as Harry testified, Harry and Wood had, prior to the murder, observed Hall and Radix from inside Wood's green Lexus, one of two differently colored Lexus vehicles that Wood possessed. Finally, although Bernard had never met Harry, she was able to identify him in a line up after seeing him in the One Love Culture Shop several weeks after the murder, where Wood, meeting Harry in response to a request for money, specifically pointed him out to Bernard as Hall's shooter.

The majority holds that the continued questioning of Ellis Wood following his request for a lawyer violated the prophylactic rule set out by the Supreme Court in *Edwards v. Arizona*, 451 U.S. 477 (1981). I do not take issue with this determination. The majority further concludes, however, that the admission at trial of Wood's exculpatory statement made pursuant to this continued questioning had a "substantial and injurious effect" on the jury's verdict — such that the New York Supreme Court, Appellate Division, Second Department, was objectively unreasonable

2

in determining, to the contrary, that this error was harmless. I emphatically disagree with this second conclusion.

We are now the third court to assess whether the introduction of Wood's videotaped statement was harmless error. The Appellate Division ruled, as the majority does here, that it was error to admit the disputed statement. However, it went on to find that "[this] error was harmless beyond a reasonable doubt in light of the overwhelming evidence of the defendant's guilt." *People v. Wood*, 835 N.Y.S.2d 414, 415 (2d Dep't 2007). The district court in this case agreed that the admission of the statement was error; applying the harmless error standard set out for use in habeas review by the Supreme Court in *Brecht v. Abrahamson*, 507 U.S. 619 (1993), the court relied principally on the strength of the other evidence against Wood to conclude, as well, that the error was harmless. My own review of the record leads me to agree with the unanimous conclusion of the previous courts to consider this issue — both that the other evidence of Wood's guilt in this case was very strong and that, assessing this factor in light of other relevant indicia of an error's harmlessness, the introduction of the disputed exculpatory statement here was harmless. I would therefore deny Wood's petition for a writ of habeas corpus.

\* \* \*

As an initial matter, the majority uses this case to resolve the appropriate standard of review to apply in reviewing state court harmless error determinations, a question left open by this Court in *Perkins v. Herbert*, 596 F.3d 161, 176-77 (2d Cir. 2010). I take no issue with the majority's conclusion that *Fry v. Pliler*, 551 U.S. 112 (2007), essentially "settled the debate" we referenced in *Perkins*, Maj. Op. at 19. Nor do I quibble with its holding that a federal court conducting habeas review of a state court judgment may appropriately apply *Brecht*'s "substantial and injurious effect"

3

test in determining whether a constitutional violation was harmless, and need not additionally apply the standard articulated after passage of the Antiterrorism and Effective Death Penalty Act of 1996 ("AEDPA") — namely, the so-called "AEDPA/*Chapman*" test, which requires a federal court to defer to a state court's conclusion that a constitutional violation was harmless beyond a reasonable doubt pursuant to *Chapman v. California*, 386 U.S. 18 (1967), so long as this conclusion was objectively reasonable, *see, e.g.*, *Mitchell v. Esparza*, 540 U.S. 12, 18 (2003).

At the same time — in a case in which the majority rejects the considered view of four justices of the Appellate Division that the error in this case was harmless beyond a reasonable doubt — it is worth noting *why* the Supreme Court in *Fry* concluded that *Brecht*'s harmless error standard survived passage of AEDPA, and why we may appropriately apply it alone in circumstances such as these. The *Fry* Court concluded that the AEDPA/*Chapman* standard was "more liberal" to habeas petitioners than the *Brecht* standard, and that it was implausible to assert that AEDPA, which otherwise "limited rather than expanded the availability of habeas relief," had *sub silentio* replaced *Brecht* with a more liberal harmless error standard. *Fry*, 551 U.S. at 119-20. The Court reiterated the concerns expressed in *Brecht* regarding the finality of state court judgments and the difficulty of retrying defendants years after the crime and found these concerns still pertinent post-AEDPA. *Id.* at 120 n.2. It also repeated an important caution from *Brecht* itself: that "'[s]tate courts are fully qualified to identify constitutional error and evaluate its prejudicial effect on the trial process . . . and . . . often occupy a superior vantage point from which to evaluate the effect of trial error.'" *Id.* at 118 (quoting *Brecht*, 507 U.S. at 636).

AEDPA directs that a writ of habeas corpus may issue in circumstances like those here only when the state decision "was contrary to, or involved an unreasonable application of, clearly

4

established Federal law, as determined by the Supreme Court of the United States." 28 U.S.C. § 2254(d)(1). The propriety of employing the *Brecht* harmless error test alone following AEDPA's enactment — without consideration of the AEDPA/*Chapman* standard — thus depends on the conclusion that the *Brecht* test "obviously subsumes" assessment of whether the state court's application of *Chapman* was objectively reasonable. *Fry*, 551 U.S. at 120. As applied by the majority, it does not. The majority enunciates our *Brecht*-related precedent properly — affirming that in evaluating an error's impact, we look both to the overall strength of the prosecution's case and to various factors indicative of the importance of the wrongly admitted evidence, including "the prosecutor's conduct with respect to the . . . evidence," Maj. Op. at 20 (alteration in original) (quoting *Zappulla v. New York*, 391 F.3d 462, 468 (2d Cir. 2004)), "whether the evidence 'bore on an issue . . . plainly critical to the jury's decision,' and 'whether [it] was material to the establishment of the critical fact or whether it was instead corroborated and cumulative," *id.* (alterations in original) (quoting *Wray v. Johnson*, 202 F.3d 515, 526 (2d Cir. 2000)). Its flawed evaluation of the evidence, however, which it fails to consider as a whole, leads it to the wrong result in this case and to a result not in keeping with *Brecht*'s animating principle — that it is "the historic meaning of habeas corpus . . . to afford relief to those whom society has grievously wronged," 507 U.S. at 637 (internal quotation marks omitted), rather than "to relitigate state trials," *id.* at 633. I address each of the factors discussed by the majority and conclude, here, that the admission of Wood's videotaped exculpatory statement was harmless.

1. The Strength of the Prosecution's Case

As the majority recognizes, the overall strength of the case against a convicted habeas petitioner is generally "the single most critical factor in determining whether error was harmless."

5

*Wray*, 202 F.3d at 526 (quoting *Latine v. Mann*, 25 F.3d 1162, 1167-68 (2d Cir. 1994)). Given this recognition, it is striking that the majority, in rejecting the considered assessment of the strength of the prosecution's case by two previous courts and five judges, concludes that the case was not strong with but a passing nod to the mutually corroborative character of the testimony provided by Harry, the shooter, and by Bernard, Wood's live-in girlfriend at the time of the murder and the mother of two children with him. It is precisely the interlocking and mutually corroborative character of this testimony, however, that belies the majority's claim that "the prosecution's case was not strong," Maj. Op. at 20.

At trial, Harry testified that on June 2, 2001, the day of the murder, he was approached by Wood, someone he knew from the time they both had spent living in the Lincoln Road neighborhood in Brooklyn. Wood asked him if he would like to make some money in exchange for shooting a man that Wood claimed had assaulted his girlfriend. Harry testified that he agreed to Wood's offer, and that the two drove in a green Lexus to the Ah Wee Travel Agency. Once there, Harry asked for $20 to get something to eat, which he was given, and Wood left the car to purchase marijuana. Wood returned and identified the victim, who was walking into the travel agency with another man, as the person who had assaulted his girlfriend. Harry, having discussed with Wood a price of $500 to shoot the victim (albeit without reaching agreement on the final sum), testified that he entered the travel agency and shot Hall twice in the chest, using a revolver that Wood had provided. Following the murder, Harry gave the gun to a friend named Damion and then used the subway to leave the crime scene. He talked to Wood again after the murder, asking for money, and was told to meet a man named Juanchi Hidalgo at his store, where Harry borrowed $10. He testified that he talked to Wood from time to time about receiving additional money for killing Hall, obtaining a total of $20

6

following the shooting.

Harry's account was then corroborated at trial by Bernard, who related to the jury a series of conversations she had with her boyfriend, Wood, following the murder of Hall, Bernard's former employer. The first such conversation occurred two to three weeks after the murder. Bernard testified that her mother telephoned the apartment that Wood and Bernard shared and that, when Wood answered, her mother called him a murderer. Wood and Bernard subsequently had a fight, during which he told her that "he could get the same person that killed [Bernard's] friend to do the same thing to [her] or [her] family." After this conversation, Bernard and her children moved out of the apartment to stay with her mother.

On July 4, 2001, Bernard brought her children back to the apartment to see their father, and again talked with Wood. She testified that Wood told her to "[l]ook [at] what he [has] done for me, for love, and I have never done anything for him." She asked him what he meant, and he proceeded to give details of his role in procuring Hall's murder.[1] Consistent with Harry's testimony, Bernard testified that Wood told her that he went to the travel agency with the person who actually shot Hall and pointed out Hall, who was walking into the office with "an Indian guy with a pony tail." From this description, she recognized the other person to be George Radix, with whom she had worked.[2]

---

[1] The State's theory at trial was that Wood's true motive was not love, but self preservation. Bernard was employed at Hall's travel agency when she first met Wood and took up with him. During her employment there, Wood regularly sent in people to purchase airline tickets with stolen credit card information in order to pocket the proceeds. Bernard was approached by federal law enforcement agents in June 2000 and was asked questions related to Wood. She was herself arrested by local authorities for her involvement in August 2000 (and on the complaint of her employer, Hall), but the charges were not pursued. With both federal and state authorities inquiring into his fraudulent scheme, Wood had an interest in ensuring that he was not further implicated by Hall.

[2] Kelly Fleary, another employee of the travel agency who was working on the day of the murder, further corroborated Bernard's testimony on this point, testifying at trial that just before his

7

Bernard also testified that Wood identified the clothes Hall had been wearing the day he was shot — brown pants and a burgundy shirt — and that Wood said he was parked near the travel agency in his green Lexus while the shooting took place. Further corroborating Harry's account, Bernard testified that Wood said the shooter shot Hall twice and that the shooter was from Lincoln Road in Brooklyn.

Bernard related to the jury a third episode with Wood that took place shortly thereafter. She was with Wood when he received a call on his cell phone from a person Wood expressly identified as the shooter, asking for money. Bernard then went with Wood to the One Love Culture Shop, a store owned by the mother of Juanchi Hidalgo, a friend of Wood's. Wood pointed the shooter out to Bernard while they were both in the car, and then left to go into the store. After this episode, Bernard contacted a federal law enforcement officer — the same one who had asked her questions in June 2000, over a year earlier, about stolen credit cards — "because [she] was frightened and scared . . . [and] wanted advice from him what to do." Bernard was later able to identify Harry in a line-up at the police station as the man Wood pointed out that day.

In the face of the detailed and mutually corroborative account of Wood's role orchestrating Hall's murder presented by Harry and Bernard, the majority supports its conclusion that the evidence against Wood was nevertheless not strong by noting that the strength of this case "rested squarely on [the witnesses'] credibility." Maj. Op. at 21. But the majority ignores the degree to which each witness's credibility was enhanced by the other's testimony, and by the further fact that the record is devoid of explanation — let alone evidence to support any such explanation — as to how Bernard knew details of the crime and was able to identify Harry as the killer except as a result of Wood's

murder Hall had arrived at the agency with Radix.

8

admissions.

The majority asserts that "both of these witnesses were heavily impeached." *Id.* Harry's past misconduct, however, simply fails seriously to undermine the strength of this case, given that his testimony was so powerfully corroborated by Bernard and by her knowledge of facts for which the only explanation at trial was that they were related by Wood. Moreover, even conceding that Harry is "the archetypal miscreant" described by the majority, *id.*, it bears observing that the most seriously damaging behavior to which the young Harry admitted at trial was the very conduct at the center of this case: Harry's agreeing to participate in the older Wood's scheme and to kill a man for no motive other than Wood's promise of some money. The majority notes that Harry testified pursuant to a plea agreement that capped his prison exposure at 20 years to life (giving him some chance of not spending almost his entire adult life in jail). It suggests that "[u]nder these circumstances, a jury would be unlikely to credit Harry's version of events absent strong corroboration." *Id.* at 22. The majority ignores the reality, however, that the government *frequently* bases successful prosecutions on the strength of cooperating witness testimony that is considerably less fully corroborated than the testimony here. Moreover, the majority neglects to mention that Harry first admitted to killing Hall and implicated Wood in this murder-for-hire scheme on the very day of his arrest, at a time when the State could still seek the maximum penalty against him.[3] *Cf. Zappulla*, 391 F.3d at 469 (noting,

---

[3] Harry initially denied committing the crime, claiming first that Wood shot Hall and then that Wood forced Harry to commit the crime by threatening his family. Within about six hours of his arrest, however, he admitted to killing Hall in exchange for the promise of money from Wood. The majority points to the supposedly impeaching effect of a later affidavit in which Harry denied Wood's involvement and wrote that "Ellis paid me (Rasheen Harry) no monetary wage for said commission of murder." But the majority neglects to mention that this affidavit was prepared while both Harry and Wood were imprisoned together awaiting trial. Harry testified that he signed it as a result of Wood's "pressuring" him over the course of three weeks, and that the words, though written by him, were provided by Wood. At trial, in response to the question, "Is, 'monetary wage,'

9

in finding a particular witness's testimony unreliable for the purposes of its harmless error analysis, that the witness "was potentially the other murder suspect" in the case but that his account exonerated him of any guilt in the killing).

As for Bernard, I simply do not understand the majority's remarkable suggestion that her *credibility* was compromised because she was *not an eyewitness*, but could only *report what Wood told her*. I also do not share the majority's conclusion that it is particularly pertinent to the strength of this case: (1) that Bernard did not at first believe that the father of her children had arranged for someone's murder; (2) that she was drawn into a fraudulent credit card scheme orchestrated by Wood; (3) that she often argued with Wood; and (4) that she did not tell Wood that she had advised police of his involvement in Hall's murder, but rather visited him in jail during the period before trial. Indeed, the latter point seems a particularly contrived reason to deem the force of her testimony "blunted," Maj. Op. at 24, given Bernard's reasonable explanation that she was "afraid [for] my life, because, at once, Mr. Wood did threaten me and told me, you know, if I give any information, that he was going to get the same person that killed [Hall] to do the same thing to me." At bottom, none of this purported impeachment is ultimately telling in the absence of an explanation as to how Bernard came to know details of the crime and the identity of the killer except through Wood. No such explanation exists on this record, and no evidence was provided to support one. I therefore agree with the trial court judge who heard Bernard testify: "She [was] a very damaging witness."

The majority, rejecting the view of the trial judge and the five judges who have, since trial,

_____

a term that you have ever used in your life?" Harry answered, "I used it once, but after once, I ain't used it no more." A close read of Harry's testimony strongly suggests that Harry's "Affidavit in Support of Statement" was more likely to have bolstered his credibility than impeached it.

10

evaluated the strength of the evidence in this case, accuses me of substituting my own assessment of the credibility of the witnesses' accounts for the hypothetical credibility assessment that would have been performed by a jury hearing their testimony in the absence of the erroneously admitted statement: "It was for the jury to decide the credibility of the witnesses, and absent the impact of the statement, they may very well not have seen that issue in the same light as does the dissent." Maj. Op. at 24. With respect, I have not substituted my own judgment for that of a jury. I have instead faithfully followed this Court's admonition that in assessing the likelihood that improperly admitted evidence affected the verdict, we must undertake an objective assessment of the strength of the remaining evidence of guilt. *See, e.g.*, *Perkins*, 596 F.3d at 177 ("Although harmless error analysis originally focused on whether the error had affected the jury, over the years our focus has shifted from the impact of the error on the jury's analysis to an assessment of the strength of the remaining evidence of guilt." (quoting *United States v. Mejia*, 545 F.3d 179, 199 n.5 (2d Cir. 2008))); *see also United States v. Ramirez*, 609 F.3d 495, 501 (2d Cir. 2010) ("We have frequently stated that the strength of the government's case is the most critical factor in assessing whether error was harmless.").

Based on that assessment, I have no difficulty concluding that a jury would easily reject the strained and speculative leaps that are required (and that the majority embraces) in an effort to identify doubt of Wood's guilt in the face of the testimony of Bernard and Harry. On the majority's proposed account, Bernard in July 2001 (before anyone had been arrested for committing this crime) armed herself with details of Hall's murder from *neighborhood gossip* — gossip that was so accurate and so detailed that she came to know that a green Lexus of the sort driven by Wood was, coincidentally, at the scene of the crime, and that the killer hailed from Lincoln Road. The intrepid

11

Bernard then chose to thrust herself into a murder investigation — *contacting the police herself* — in order falsely to implicate Wood in the hope that in aiding in the wrongful conviction of her live-in boyfriend, she could put to rest any lingering fears of prosecution arising out of an arrest for credit card fraud that had occurred almost a year earlier, for which the charges had been dismissed. The majority neglects to mention in this regard that both Wood and Harry were arrested only *after* Bernard came forward with her account of Wood's admissions. This detail is important, because it opens the curtain on the true acrobatics of the majority's theory of the case. For as the majority would have it, Bernard, piecing together neighborhood gossip, was able not only persuasively (but falsely) to implicate Wood to police. She also managed to identify the Lincoln Road killer — a person there is no evidence she ever met — in a line up.[4] That killer then paid her the truly remarkable courtesy of confessing and, within hours of his arrest, *also* falsely implicating Wood (a person he conveniently happened to know), right down to asserting that the pair drove to the scene in the green Lexus Bernard had already described to police.

With respect, these contortions amount to rejecting the strength of the government's case, not evaluating it, as our case law demands. *See United States v. Reifler*, 446 F.3d 65, 87 (2d Cir. 2006) (noting that of all the factors used to evaluate whether a particular error was harmless, "[t]he strength of the prosecution's case is probably the single most critical factor" (alteration in original) (quoting *Latine*, 25 F.3d at 1167-68)). Wood had every incentive at trial to raise any possible avenue of impeachment in attempting to blunt the force of the combined testimony of Harry and Bernard. He failed to do so in any meaningful way because he could not — and that remains the

---

[4] To be clear, there is also no evidence that Bernard knew or had ever heard of Harry's girlfriend, a person referred to only fleetingly in Harry's testimony and alluded to by the majority as the potential source for some of the gossip that Bernard supposedly picked up.

12

case whether his erroneously admitted exculpatory statement is in evidence or not.

The majority suggests, finally, that we may presume the case was weak — or at least that the jurors were in disagreement — because the jury deliberated into a third day. Suffice it to say that I do not find this claim persuasive. Even when a trial results in a hung jury (a fact conclusive on the subject of dissension among jurors) we have cautioned against drawing broad inferences about the strength of the case, noting that "[a] jury may hang for any number of reasons, including the idiosyncratic views of a single juror." *United States v. Newton*, 369 F.3d 659, 680 (2d Cir. 2004). The same holds for the length of jury deliberations. The majority makes much of the fact that the jurors asked to see Wood's statement replayed. But the jurors also asked to hear Bernard's testimony during their deliberations, along with selected portions of Harry's, as well as to view Harry's videotaped confession and his two other statements to police (but not his Wood-dictated "Affidavit in Support of Statement"). This suggests that jurors took time because they were paying scrupulous attention to the totality of the evidence in this case — evidence that powerfully implicated Wood, taking no account of his erroneously admitted denial of the crime.

In sum, after carefully reviewing Bernard's account of Wood's admissions to her, in combination with Harry's own detailed description of his and Wood's interactions as Wood solicited his help in killing Hall, I am in full agreement with the five judges who have considered this case already and have concluded that the evidence was very strong. The testimony of Bernard and Harry together constituted a fully corroborated and coherent narrative of guilt that was powerfully incriminating, irrespective of Wood's statement denying culpability. The majority's claim to the contrary disregards the interlocking character of the testimony offered by Bernard and Harry and the strong indicia of reliability created by these two independent sources of incrimination. I have

13

no hesitation in deeming this case strong, not weak, a factor that weighs heavily in favor of a finding of harmlessness.

2. The Importance of the Improperly Admitted Evidence

The next factor to be considered is the importance of the erroneously admitted evidence. *See Wray*, 202 F.3d at 526. The disputed statement, as the majority notes, was not a confession, but rather an account of Hall's murder intended by Wood to be exculpatory with respect to his own role in procuring it. In his approximately fifteen minute statement (made to an Assistant District Attorney after Wood was apprised of his *Miranda* rights, *see Miranda v. Arizona*, 384 U.S. 436 (1966), for at least the second time), Wood asserted that he had been at the scene of the crime, that he saw Harry and a friend in a Honda there, and that he, Wood, in making conversation, pointed out Hall, who was walking down the street, as someone with whom his girlfriend had experienced problems. A few minutes later, he heard two gunshots and then saw Harry coming around the corner. Subsequent to Hall's murder, Wood stated that he gave Harry a little money occasionally and "a bag of weed" in response to his requests. While he did not claim to have actually seen Harry commit the murder, Wood stated that he believed Harry had done so, and that he sent Harry away from the video store he owned, calling Harry "crazy." Wood claimed that after the crime, he "tried to don't even have conversations with [Harry]. I didn't trust him any more. I didn't know if he was gonna shoot me."

Wood's videotaped statement was thus an account of Hall's murder intended by him to be exculpatory, and not a confession to his own role in orchestrating the crime. To the extent it bore on "the central disputed issue," *Wray*, 202 F.3d at 530, whether Wood "procured commission of [Hall's] killing pursuant to an agreement with a person other than the intended victim" in exchange

14

for something of value, N.Y. Penal Law § 125.27(1)(a)(vi), it constituted a denial by Wood that he committed the crime.

The majority asserts that the videotape nevertheless had a substantial, injurious influence at this trial because it "'locked [Wood] into' an implausible and highly incriminating depiction of the shooting." Maj. Op. at 26. The admissible evidence, however, had already put Wood in the lockbox that the majority describes. As outlined previously, to create a reasonable doubt in the mind of the jury, Wood faced the difficult task of explaining why the admitted shooter would identify him as the procurer of the murder-for-hire — at a time when in doing so he implicated himself in a first degree murder with no cooperation agreement in place — or why Wood's then-girlfriend would corroborate this account with detailed testimony relating Wood's admissions to her regarding his role. And, again, Wood needed some theory as to how Bernard even knew the details of the crime she related and was able to pick Harry out of a line up if her account of Wood's admissions was in any way untrue.

Indeed, Wood's videotaped statement was *helpful* to the defense to the extent it suggested an otherwise missing explanation as to how Bernard came upon her knowledge of the crime — namely, through supposedly truthful statements made by Wood, who was present at the scene. The defense, arguing that "[w]hen it was in [Bernard's] best interest to get rid of Ellis Wood, she had no problem going to the authorities," played the videotape during its own summation, using it in precisely this way:

> Now, again, Ms. Bernard is telling you basically about what she thinks were some conversations she had with Ellis Wood. And she's telling you about what she thinks were some observations that she made about Ellis Wood having some kind of meeting with Rasheen Harry.
> In a couple of minutes, or at some point today before I sit down, and close to the end when I sit down, you will know when you see the video tape that . . . I will

15

not be talking to you much beyond that.

   But, in that video tape, Ellis Wood speaks to Detective Arnao, and tells Detective Arnao what Ellis Wood got to say about what happened on June 2nd.

   When you watch that video tape, I'm going to ask you to watch very, very carefully. . . . [W]e will prove to you that what my client says to you in that video tape is accurate and that it's truthful and that you can rely on it.

   The fact of the matter is it's something you can rely on a whole lot more than anything you're hearing from Rasheen Harry and anything you're hearing from Nisha Bernard.

To be clear, I do not take issue with the majority's conclusion that the admission of Wood's exculpatory statement was harmful to the defense in various ways — principally, by further corroborating the facts that Wood was present at the scene, that he identified Hall to Harry, and that he paid Harry after the fact. To the extent it locked Wood into an implausible story, however, the record is devoid of *any* indication that without the videotape, there was any *more* plausible tale to be told. Thus, the majority suggests that the videotape was "devastating to the defense argument that Harry was an irresponsible fabricator." Maj. Op. at 27. But Bernard's testimony bolstered Harry's credibility more than the videotape since, after all, she was the person to whom Wood, in substance, *confessed*. On this record, the only explanation as to how Harry and Bernard came to offer mutually corroborative accounts of a crime at which only one of them was present comes down to Wood himself — the common denominator between them. This fact renders their accounts highly persuasive and any supposed alternative defense that Wood could have presented, absent the videotape, wholly ephemeral.

The majority argues that the prosecution made substantial use of Wood's videotaped statement in its closing argument, and that this factor weighs against a finding of harmlessness. While the prosecution's early focus in this respect was to some degree necessitated by the defense counsel's own, previous use of the videotaped statement in dramatically closing *its* summation, I do

16

not dispute that the prosecution referred to and made use of Wood's statement.  The prosecution did not dwell on this statement alone, however, but instead wove it into the coherent narrative created by the testimony of the two principal witnesses.  *See Gutierrez v. McGinnis*, 389 F.3d 300, 309 (2d Cir. 2004) (noting, in finding harmless the improper admission of a 911 tape, that "the prosecutor highlighted the [evidence] as only *one* of several important pieces of evidence that the prosecutor stressed during his lengthy summation").

Thus, while the majority claims that Wood's statement was crucial to the establishment of Harry's credibility, the prosecution noted numerous reasons present in the record for the jury to credit Harry's testimony — from the lack of any other plausible motive for Harry to kill Hall other than the promise of payment, to the fact that Harry's cooperation agreement still left him serving a significant sentence and that he had implicated Wood, as well as himself, well before receiving the agreement.  The prosecution also observed, importantly, that "[Harry's] testimony doesn't stand on its own":

> [Bernard] takes her kids back to see [Wood] on the 4th of July.  When she is there, he starts laying the whole thing down and, ladies and gentlemen, he provides her with details that she couldn't have known from any other source other than a person who was there and set it up.
> . . . .
> . . . [I]n July . . . Mr. Wood picks her up and drives her to Juanchi's store and says, "We're going there because I am going to pay the man who killed Mr. Hall. He wants money. . . ."
> . . . Mr. Wood points out that man. . . .
> And you know that he did because, ladies and gentlemen, Nisha Bernard looked at a police line-up and out of six people that she had never seen before, she picked out Rasheen Harry accurately and correctly.
> Because Rasheen Harry is the gunman.  He's the killer.  How could she possibly have done that if Mr. Wood, in fact, had not pointed him out that day? There is no answer for that other than the fact that he did, he did tell her that it was the man.
> And, again, the police didn't come looking for her.  She went looking for them. . . .

17

The prosecution's discussion of Wood's videotaped statement thus occurred in the context of a summation that focused principally on the testimony of Harry and Bernard. Even if the majority is right in concluding that the videotape was given a "prominent place," Maj. Op. at 29, moreover, the prosecution's conduct in referring to erroneously admitted evidence simply "does not weigh as heavily in our [harmless error] analysis as the overall strength of the prosecution's remaining case," *Perkins*, 596 F.3d at 179; *see also id.* (concluding that even though prosecutor made numerous references to improperly admitted confession during summation, the error in admitting the confession was harmless in light of the strength of remaining evidence establishing guilt). And contrary to what the majority contends, this case was strong indeed.

The final factor to consider is whether the videotape was corroborative and cumulative of other properly admitted evidence. The district court found that it was, as it did not establish any facts not already established by other testimony but, instead, primarily corroborated Harry's testimony. The majority does not disagree, but claims that "where guilt rests on witness credibility, key evidence affecting credibility is not merely corroborative or cumulative: by permitting the jury to credit otherwise suspect testimony, it provides a key link in the prosecution's case." Maj. Op. at 30. While the majority quotes approvingly the language in *Zappulla* that evidence is not cumulative when it "fill[s] in a missing link," *Zappulla*, 391 F.3d at 472, however, *Zappulla* involved an improperly admitted statement that constituted the only evidence of motive the prosecution had, *see id.* at 473. In contrast here, the majority can point to *nothing* in Wood's statement not otherwise before the jury and is forced instead to rely on its effect in bolstering the credibility of Harry, in which respect the statement was nevertheless *still cumulative of Bernard's testimony*. *See Perkins*, 596 F.3d at 179 (finding a defendant's recorded statement cumulative when properly admitted oral

18

statement from defendant stated essentially the same facts); *see also Newton*, 369 F.3d at 679-80 (noting in finding admission of a statement harmless that the defendant "had essentially acknowledged" the same fact evidenced by the disputed statement in an admissible statement that was itself corroborated by other testimony). I agree with the district court that the statement was in large part cumulative of other evidence properly introduced at trial, and that this fact weighs against Wood's claim that the error was not harmless.

\* \* \*

While the factors considered above may not uniformly point to finding the error harmless, it is the decisive strength of the prosecution's case, "the most important factor in our inquiry," *Perkins*, 596 F.3d at 179, that leads me to conclude that the admission of Wood's videotaped statement did not have a "substantial and injurious effect or influence in determining the jury's verdict." *Brecht*, 507 U.S. at 637 (quoting *Kotteakos v. United States*, 328 U.S. 750, 776 (1946)). Even without its admission, the detailed and mutually corroborative testimony of Harry and Bernard clearly established Wood's role in the murder-for-hire of the victim Carlisle Hall. Moreover, Wood's statement, intended by him to be exculpatory, contained no facts not already in evidence through the other testimony presented at trial, and even its effect in strengthening the credibility of Harry was cumulative of Bernard's testimony. The majority misapplies *Brecht* in this case and rejects as objectively unreasonable the eminently reasonable judgment of the Appellate Division that the error here was harmless. I respectfully dissent from the court's grant of a writ of habeas corpus on this appeal.

19